1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   EASTERN DISTRICT OF CALIFORNIA

8

9   DELTAKEEPER CHAPTER OF          )   1:06-cv-0837 OWW DLB
    BAYKEEPER, a California non-    )
10  profit corporation, MOTHER LODE )   SCHEDULING CONFERENCE ORDER
    CHAPTER OF SIERRA CLUB, a       )
11  California non-profit           )   Discovery Cut-Off: 8/1/07
    corporation, and WATERKEEPER    )
12  ALLIANCE, INC., a New York not- )   Non-Dispositive Motion
    for-profit corporation,         )   Filing Deadline: 8/15/07
13                                  )
                Plaintiffs,         )   Dispositive Motion Filing
14                                  )   Deadline: 8/30/07
         v.                         )
15                                  )   Settlement Conference Date:
    S & H DAIRY, a California       )   11/28/06 Ctrm. 9 1:30
16  general partnership, RONALD     )
    HILARIDES, an individual, PETER )   Pre-Trial Conference
17  SCHAAFSMA, an individual,       )   Date: 11/19/07 11:00 Ctrm.
                                    )   3
18              Defendants.         )
                                    )   Trial Date: 12/11/07 9:00
19  _____ )   Ctrm. 3 (CT-10 days)

20

21  I.   Date of Scheduling Conference.

22       November 2, 2006.

23  II.  Appearances Of Counsel.

24       Layne Friedrich, Esq., appeared on behalf of Plaintiffs.

25       Eric Bronson, Esq., appeared on behalf of Defendants.

26  III.  Summary of Pleadings.

27       1.   S & H Dairy, Peter Schaafsma, and Ronald Hilarides,

28  (collectively referred to as "Defendants"), are owners and/or

                              1

operators of a concentrated animal feeding operation ("CAFO") located at 3945-4125 Bentley Road, Oakdale, CA 95361 (referred to as the "S & H CAFO").  The S & H CAFO currently houses approximately 2,400 dairy cattle.  The S & H CAFO produces many types of waste material, such as liquid and solid manure, bedding, spilled or spoiled feed, animal hair, wastewater runoff from corrals and other areas, wash water, cleaning compounds, and contaminated sediment and dirt (collectively referred to as "CAFO Waste").  The operations at the S & H CAFO, such as flushing the concrete alleys in freestall barns which house the cows with water and washing the cows prior to milking, generates at least 34 million gallons of wastewater each year (up to 189,000 gallons per day).  Wastewater is also generated at the S & H CAFO when rainfall contacts manured areas, such as the corrals and other areas where the cows are kept, manure storage areas, spoiled feed, and other pollutant source areas at the S & H CAFO.  This wastewater contains manure and other solids, pathogens, ammonia, total dissolved solids, total suspended solids, toxic metals, and other pollutants associated with dairy farming.  Manure may contain "arsenic, copper, selenium, zinc, cadmium, molybdenum, nickel, lead, iron, manganese, aluminum and boron" as well as antibiotics and growth hormones.[1]  The Defendants store and/or dispose of wastewater in lagoons or other surface impoundments at the S & H CAFO.  Wastewater in lagoons is discharged when the lagoon breaks, spills over top, or otherwise fails to contain the

---

[1] See *Confined Animal Feeding Facilities in California*, November 2004.

1  waste.  Wastewater is also discharged when the wastewater

2  collection and/or return systems fails to contain the waste.

3       2.   The Defendants dispose of their CAFO waste by spraying

4  and/or flooding the waste on croplands or other open fields owned

5  or operated by the Defendants.  When CAFO waste is over applied

6  or misapplied to the land application fields, or during the wet

7  season when storm water contacts the S & H CAFO land application

8  fields, pollutants can be discharged into local waterways.  For

9  example, on February 28, 2005, the Defendants discharged

10 approximately 285,000 gallons of wastewater from the S & H CAFO

11 to local waterways.  Among other environmental impacts caused by

12 CAFOs, the EPA recognizes CAFOs as significant sources of

13 phosphorus, especially due to the runoff from land application

14 areas.  Wastewater, CAFO waste, and/or polluted storm water,

15 generated at the S & H CAFO discharges to drains and laterals,

16 including the Cleveland Drain, the Kuhn Drain, Stowell Lateral,

17 Thompson Lateral, the Modesto Irrigation District Main Canal

18 ("MID Main Canal"), and ultimately the Stanislaus River and the

19 San Joaquin-Sacramento River Delta.

20      3.   The Federal Water Pollution Control Act, 33 U.S.C.

21 § 1251 et seq. ("Clean Water Act" or "CWA") prohibits the

22 discharge of pollutants to waters of the United States unless the

23 discharger applies for, obtains, and operates in compliance with

24 a National Pollution Discharge Elimination System ("NPDES")

25 permit.  *See* 33 U.S.C. §§ 1311, 1342.  The Clean Water Act

26 defines "pollutant" to include solid waste, biological materials,

27 heat, rock, sand, industrial waste, and agricultural waste, among

28 others.  33 U.S.C. § 1362(6).  Section 502 of the CWA defines a

"point source" as "any discernible, confined and discrete conveyance, including ... any ... concentrated animal feeding operation." 33 U.S.C. § 1362(14). Under the Clean Water Act, all point sources that discharge pollutants to a water of the United States must obtain a NPDES permit for their discharge. 33 U.S.C. §§ 1311(a), 1342(a). 40 C.F.R. § 122.21(a) provides that "[a]ny person who discharges pollutants ... and does not have an effective permit ... must submit a complete application" for an NPDES permit. This duty to apply for an NPDES permit applies to CAFOs. *See* 40 C.F.R. § 122.23(d)(1) (2003); 40 C.F.R. § 122.21(a) (2002). An animal feeding operation that has more than 700 mature dairy cows is a CAFO. 40 C.F.R. § 123.23(b)(4)(i) (2003); 40 C.F.R. Part 122 Appendix B (2002). The CAFO as a whole is a point source and the owner and operator are required to obtain NPDES permit coverage for discharges from the CAFO to waters of the United States. 40 C.F.R. § 123.23(a) (2003); 40 C.F.R. Part 122 Appendix B (2002). On February 12, 2003, the United States Environmental Protection Agency ("EPA") promulgated regulations requiring all then-existing CAFOs to obtain an NPDES permit and comply with the new regulations by April 14, 2003. 40 C.F.R. § 122.23(g)(1) (2003). All owners and operators of dairy CAFOs are required to comply with regulations set forth at Sections 122.23, 122.42(e) and Part 412 of Title 40 of the Code of Federal Regulations. 40 C.F.R. § 123.25 (2003). Prior to April 14, 2003, CAFO owners/operators were required to comply with regulations set forth at 40 C.F.R. §§ 122.23, 122 Appendix B, and Part 412 (2002). 40 C.F.R. § 123.25 (2002). 40 C.F.R. §§ 412.31(a)(1), 412.32(a)(1), and 412.33(a)(1) (2003)

4

1   prohibit the discharge of manure, litter, or process wastewater

2   into waters of the United States from the production area unless

3   the discharge is caused by runoff from a 25-year, 24-hour rain

4   event, the production area is designed, maintained, and

5   constructed to contain all manure, litter, and process wastewater

6   including runoff from a 25-year, 24-hour rainfall event, and the

7   production area is operated in compliance with 40 C.F.R.

8   §§ 412.37(a) and 412.37(b) (2003).  Further, the CAFO must attain

9   the limitations set forth above as of the date of permit

10  coverage.  40 C.F.R. § 412.31(a)(3) (2003).  Failure to comply

11  with these requirements is a violation of Section 301(a) of the

12  CWA, 33 U.S.C. § 1311(a).  Although some of the 2003 federal CAFO

13  regulations were challenged and are being modified, the

14  requirements to apply for and obtain an NPDES permit to regulate

15  discharges of pollutants to waters of the United States has not

16  changed.  Defendants have not applied for or obtained the

17  required NPDES permit for their operations at the S & H CAFO.

18  The failure to apply for and obtain the required permit

19  regulating the S & H CAFO is a violation of the Clean Water Act.

20  Plaintiffs seek declaratory and injunctive relief to require

21  Defendants to comply with the substantive and procedural

22  requirements of the Clean Water Act.  Plaintiffs also seek the

23  imposition of civil penalties, which are mandatory for violations

24  of the Clean Water Act, as well as the reimbursement of

25  reasonable litigation costs.

26      4.   Defendants applied for and obtained coverage under the

27  *State of California's State Water Resources Control Board (State*

28  *Water Board) Water Quality Order No. 97-03-DWQ National Pollution*

5

*Discharge Elimination System (NPDES) General Permit for Discharges of Storm Water Associated with Industrial Activities Excluding Construction Activities* ("Storm Water Permit").  While Defendants' coverage under the Storm Water Permit signals their knowledge of the regulations requiring NPDES coverage for discharges of pollutants, the Storm Water Permit does not contain the federal regulations or requirements applicable to CAFOs and thus does not adequately or completely regulate operations at the S & H CAFO.  Therefore, while Defendants have obtained a permit for their discharges of storm water, they are still in violation of the Clean Water Act because they have not applied for or obtained a permit to regulate the discharge of wastewater from the S & H CAFO.  Additionally, Plaintiffs contend that Defendants are in violation of the Storm Water Permit for discharging pollutants in violation of the terms of the Storm Water Permit, for failing to develop and/or implement a storm water pollution prevention plan which meets the requirements of the Storm Water Permit, and for failing to develop and/or implement a monitoring and reporting program that meets the requirements of the Storm Water Permit.  Violations of the Storm Water Permit are violations of the Clean Water Act.  Plaintiffs' complaint seeks declaratory and injunctive relief to require Defendants compliance with the Storm Water Permit.  Plaintiffs also seek civil penalties and the reimbursement of its reasonable litigation costs.

**Defendants' Summary**

5.   Defendants S & H Dairy, Peter Schaafsma, and Ronald Hilarides ("Defendants"), are owners and/or operators of a

1   concentrated animal feeding operation ("CAFO") located at 3943-
2   4125 Bentley Road, Oakdale, CA 95361 (referred to as the "S & H
3   CAFO").  The S & H CAFO currently houses approximately 2,400
4   dairy cattle and is designed to fully contain all wastewater
5   produced by its dairy operations.  Initially, this wastewater is
6   temporarily held in a large lagoon, but it is ultimately pumped
7   to land application areas where crops are grown.  These crops
8   need and uptake the nutrients provided by the wastewater -
9   without it, commercial fertilizers would have to be provided to
10  achieve optimal growth.

11       6.    There are a number of laws and regulations that are
12  meant to minimize pollution to the environment, both as to water
13  and air, that are applicable or potentially applicable to CAFOs,
14  including the S & H CAFO.  Plaintiffs have specifically alleged
15  violations of the Federal Clean Water Act (33 U.S.C. § 1251 et
16  seq.), although there are numerous California laws and
17  regulations that also apply with regard to potential water
18  pollution (the subject matter of this lawsuit).  The agency
19  tasked with implementation and enforcement of all of these
20  federal and state water pollution laws is California's State
21  Water Resources Control Board ("State Water Board") and its nine
22  Regional Water Quality Control Boards ("Regional Water Boards").
23  These state agencies have primary responsibility for the
24  coordination and control of water quality.  The Regional Water
25  Board with jurisdiction over CAFOs located in California's
26  Central Valley Region is known as Region 5 ("Region 5").

27       7.    With regard to federal water pollution laws, the State
28  Water Board (and the Regional Water Boards under it) derives this

7

power as the implementing agency designated by the Federal
Environmental Protection Agency ("EPA").  The EPA is in the
process of developing a "CAFO rule" to assist implementing
agencies and CAFO operators in understanding their legal
obligations under the Clean Water Act and in assisting operators
in choosing whether or not to apply for a permit under the
National Pollution Discharge Elimination System ("NPDES").
Although a CAFO Rule was promulgated in 2003, it was immediately
challenged by both environmental groups (including some of the
Plaintiffs in this action) and agricultural groups.  Many
portions of the 2003 CAFO rule were overturned by the Second
Circuit Court of Appeals and the EPA has recently released a
draft revised CAFO Rule, which will likely be finalized, in some
form, sometime in 2007.[2]

_____

[2] This draft modified CAFO Rule specifically addresses one
of the issues in this case, whether a CAFO has a "duty to apply"
for a permit simply because it has had a discharge in the past.
In its "Revised National Pollutant Discharge Elimination System
Permit Regulation and Effluent Limitation Guidelines for
Concentrated Animal Feeding Operations in Response to Waterkeeper
Decision [*Waterkeeper Alliance, et al. v. EPA*, 399 F.3d 486 (2d
Cir. 2005)]," released on June 30, 2006 (70 FR 75771), the EPA
made it clear that it does not believe that a past discharge, in
and of itself, triggers a duty to apply: "In order to guide CAFOs
in making a decision on whether or not to seek permit coverage,
EPA suggests that Large CAFOs falling into one or more of these
categories should consider seeking permit coverage (this list is
not intended to be exhaustive): .... 4. Where the CAFO has had a
discharge in the past and has not corrected the factors that
caused the discharge to occur."  (Emphasis added.)  (71 FR 37751)
Defendants believe the meaning of this language could not be more
clear - if a CAFO has "corrected the factors that cause the
discharge to occur," then the EPA is not even suggesting that a
CAFO NPDES permit be sought, let alone requiring it.

8

1    8.    With regard to state water pollution laws, the State
2    Board is granted this power by statute under the Porter-Cologne
3    Water Quality Control Act (Porter-Cologne), in which the
4    California Legislature declared that the "state must be prepared
5    to exercise its full power and jurisdiction to protect the
6    quality of the waters in the state from degradation ..."
7    (California Water Code Section 13000).    The State Board and
8    Regional Boards also work cooperatively with other state
9    agencies, including the Department of Fish and Game and state and
10   local prosecutors, as well as federal EPA agents and attorneys
11   from the Department of Justice, to enforce all of the laws under
12   their jurisdiction.

13   9.    As set forth on the State Board's website
14   (http://www.waterboards.ca.gov/npdes/cafo.html), "California has
15   approximately 2,200 dairies with an average size of about 700
16   milk cows.    There are also several hundred feedlots, poultry
17   operations, and other animal feeding operations (AFOs) in the
18   state.    California regulations refer to these operations,
19   including concentrated animal feeding operations (CAFOs), as
20   "confined animal facilities" (CAFs).    The exact number of
21   facilities that are CAFOs based on animal populations is unknown
22   but is estimated at between 1,000 and 1,200 ...

23   10.    Each Regional Water Board develops the regulatory
24   program it uses for CAFs.    Most of the commercial CAFs are in the
25   Central Valley Region, including over 80 percent of the dairies.
26   There are about 150 dairies and feedlots in the Santa Ana Region
27   and about 200 dairies (mostly smaller facilities with less than
28   300 milk cows) in the North Coast and San Francisco Bay Regions.

1   There are also some CAFs in other regions, including a few CAFOs.
2   Dairies and feedlots in the Santa Ana region operate under a
3   General NPDES permit that requires preparation of an engineered
4   waste management plan.  Most of the CAFs in the Santa Ana Region
5   do not apply manure to cropland.

6       11.   The Central Valley Regional Water Quality Control
7   Board was developing a general NPDES permit for dairies, but
8   stopped when the Second Circuit Court of Appeals ruled that only
9   facilities discharging to a water of the United States need a
10  permit.  Such discharges are prohibited at CAFs in California,
11  and as a result of a strong enforcement program, few of these
12  discharges occur.  The Central Valley Water Board is now
13  developing a general Waste Discharge Requirements (WDR) Order to
14  regulate the dairies.  The WDR Order is essentially a state
15  permit, and a tentative version of the order is expected in mid-
16  2006.

17      12.   The WDR Order will require the dairies to develop and
18  implement nutrient management plans and to submit annual reports.
19  The permitted facilities will pay an annual fee that is based on
20  animal population and ranges from $200 to $4,000 plus a surcharge
21  to support the Surface Water Ambient Monitoring Program (SWAMP).
22  Since impact to groundwater is the major concern at these CAFs,
23  the WDR Order is expected to require groundwater monitoring at
24  some facilities.

25      13.   As part of the WDR Order implementation process, in
26  October 2005 dairies in the Central Valley Region were required
27  to submit a Report Of Waste Discharge (ROWD) and pay a filing fee
28  equivalent to the first annual fee.  Approximately 99% of the

1   1,650 dairies did so.

2       14.   As a CAFO and a CAF, the S & H CAFO operates according
3   to the orders issued by Region 5, including an individual Waste
4   Discharge Requirement ("WDR"), which prohibit CAFOs and CAFs from
5   having any non-agricultural storm water discharges of wastewater
6   produced by the CAFO/CAF.   (Under applicable regulations,
7   agricultural storm water discharges are exempt under the Clean
8   Water Act.)   Despite this prohibition, on February 28, 2005,
9   after a heavy rain had caused run-off from the production areas
10  of the dairy to fill the lagoon to the point that defendant
11  Hilarides was concerned that it might overflow, he pumped
12  wastewater for about two hours onto the land application areas of
13  the S & H CAFO, without checking to confirm that the valve that
14  allowed agricultural storm water to drain off the land
15  application areas was closed.   Unfortunately, the valve was open
16  and the land application areas were saturated from the heavy
17  rainfall, so some of the wastewater, along with excess rainfall,
18  discharged off of the S & H CAFO into the Cleveland Drain, where
19  it mixed with agricultural storm water from both the S & H CAFO
20  and other farms adjacent to the drain.

21      15.   Defendants received a Notice of Violation ("NOV") from
22  Region 5 regarding the February 28, 2005 discharge.   The NOV
23  specifically stated that the discharge was in violation of, among
24  other statutes and regulations, the Clean Water Act, and that the
25  violation was "subject to enforcement action."   The NOV requested
26  that Defendants submit a written report outlining the management
27  practices to be implemented "to prevent further discharges of
28  wastewater."   Defendant Hilarides submitted the requested report,

apologizing for the lapse in judgment that led to the discharge and taking full responsibility for it.  Defendant Hilarides also set forth the actions he would take "to eliminate the possibility of future wastewater discharges to the Cleveland Drain and ultimately into the Modesto Irrigation District."  These actions included a commitment to dredge the lagoons more frequently to create more holding capacity for wastewater, as well as the expenditure of over $200,000 to install a manure "solids separator."  This solids separator would remove the manure solids from the wastewater, which would not only create more holding capacity but also lower the nutrient content of the wastewater applied to the land application areas.  The solids themselves would be composted into useable fertilizer.

16.  However, despite these corrective measures, Region 5 also followed through with "enforcement action" by coordinating with the Stanislaus County District Attorney's Office.  A "Complaint for Injunction, Civil Penalties and Other Relief" was filed on September 13, 2005 and a "Stipulated Judgment for Injunction, Civil Penalties and Other Relief" was filed on September 16, 2005.  This judgment permanently enjoined Defendants from "[v]iolating any environmental offenses" and imposed civil penalties totaling $13,419.70 (of which $6,000 was stayed if no other violations occurred for three years) and $580.30 for filing fees.

17.  Defendants have complied with the terms of the Stipulated Judgment and there have been no discharges of wastewater from the S & H CAFO since the discharge that was the subject of Region 5's enforcement action.  In addition,

12

1   Defendants have installed the solids separator (at a total cost

2   of over $200,000) and have hired a consultant to develop a more

3   formalized and technical Nutrient Management Plan ("NMP"), even

4   though Region 5 does not yet require it.  (Region 5 is presently

5   developing a general WDR that it intends to require all CAFOs and

6   CAFs to follow, and it is anticipated that this general WDR will

7   require the development and implementation of a more formalized

8   and technical NMP than is currently required.  Defendants

9   anticipate that their new NMP will be developed by November 2006

10  and they intend to implement it as soon as possible thereafter.

11  In addition, Defendants remain ready, willing and able to

12  promptly abide by whatever future directives they receive either

13  from Region 5 or the Court, whether that be participation under a

14  general WDR (as currently proposed by Region 5), a general CAFO

15  NPDES permit (if Region 5 changes direction) or an individual

16  CAFO NPDES permit (as Plaintiffs insist is required).)

17  IV.  Orders Re Amendments To Pleadings.

18       1.   The parties have been conducting settlement talks since

19  June 2006 in an effort to resolve the action without protracted

20  litigation.  Plaintiffs believe that settlement is in the

21  parties' best interest and thus have not sought to amend their

22  complaint to add RCRA claims.[3]  The parties are currently

23

24       [3] Pursuant to the Clean Water Act's federal implementing
    regulations, 60 days notice of a person's intent to file a
25  complaint asserting CWA violations must be sent to the
    responsible parties.  Pursuant to RCRA, 90 days notice prior to
26  filing suit must be given.  Plaintiffs sent the notice on April
    21, 2006 and filed the complaint for violations of the CWA on
27  June 30, 2006.  The parties have been conducting settlement
    talks, and Plaintiffs believe that the parties can settle the CWA

28

1  discussing scheduling a settlement meeting with all parties,
2  including client representatives, and thus would like to continue
3  to focus on settlement for the next couple months.  Plaintiffs
4  therefore propose February 1, 2007, as the last day to join
5  parties or amend pleadings.  Defendants propose December 5, 2006,
6  as the last day to join parties or amend pleadings.

7  V.    Factual Summary.

8       A.    Admitted Facts Which Are Deemed Proven Without Further
9  Proceedings.

10            1.    The S & H Dairy is a general partnership organized
11  under the laws of the State of California.  The partners in the S
12  & H Dairy are Peter Schaafsma and Ronald Hilarides.  The S & H
13  Dairy, along with Peter Schaafsma and Ronald Hilarides, own and
14  operate a CAFO at 3943-4125 Bentley Road, Oakdale, CA 95361.  The
15  Defendants are also the owners of the property located at 3943-
16  4125 Bentley Road in Oakdale, CA.  The Defendants are "persons"
17  under the Clean Water Act.

18            2.    In 2002 there were approximately 2,000 milking
19  cows and 400 dry cows at the S & H CAFO, while the S & H CAFO
20  currently houses approximately 2,000 milking cows and 400 dry
21  cows.  The S & H CAFO generates at least 34 million gallons of
22  wastewater each year (up to 189,000 gallons of wastewater
23  everyday).  On February 28, 2005, the Defendants discharged
24  wastewater from the S & H CAFO land application crop fields to
25  waters of the United States.

26

27  claims; thus Plaintiffs have not sought to amend the complaint at
28  this time.

1          3.    The existing beneficial uses of local water bodies

2   include agricultural (irrigation and stock watering) and

3   industrial uses, contact recreation such as bathing, non-contact

4   recreation such as boating, freshwater habitat for warm and cold

5   water species, fish migration, fish spawning, and wildlife

6   habitat.  *See* The Water Quality Control Plan for the California

7   Regional Water Quality Control Board, the Sacramento River Basin

8   and the San Joaquin River Basin, California Regional Water

9   Quality Control Board Central Valley Region, II-2.00 and II-8.00

10  (Fourth Edition, Revised 2004 (with Approved Amendments)) ("Basin

11  Plan").

12       B.    Contested Facts.

13          1.    Although Defendants' time to file their responsive

14  pleading has not run, and thus Plaintiffs do not know the extent

15  of facts in dispute, Plaintiffs believe the following categories

16  of facts are in dispute:

17          2.    Whether Defendants have developed and implemented

18  pollution control measures at the S & H CAFO to prevent

19  wastewater and/or storm water from discharging from the S & H

20  CAFO and/or to area drains and laterals, including the Thompson

21  Lateral, the Cleveland Drain, the Kuhn Drain, the Stowell

22  Lateral, the MID Main Canal, and eventually the Stanislaus River

23  and San Joaquin-Sacramento River Delta.

24          3.    Whether the Defendants apply wastewater and solid

25  waste, including solid manure and other CAFO waste, at rates

26  above agronomic rates to the approximately 270 acres of disposal

27  fields at the S & H CAFO.

28          4.    The extent of environmental harm, if any, caused

15

1  by the Defendants' failure to comply with the Clean Water Act and

2  federal implementing regulations.

3  VI.  Legal Issues.

4      A.  Uncontested.

5          1.  This Court has subject matter jurisdiction over

6  the parties and this action pursuant to Section 505(a)(1) of the

7  Clean Water Act, 33 U.S.C. § 1365(a)(1), and pursuant to 28

8  U.S.C. § 1331 (an action for declaratory and injunctive relief

9  arising under the Constitution and laws of the United States).

10  Venue is proper in the Eastern District of California pursuant to

11  Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1),

12  because the source of the violations is located within this

13  judicial district.

14          2.  The parties agree that the regulations issued by

15  the EPA and found in 40 C.F.R. §§ 122.23, 122.42 and 412 et seq.,

16  apply to owners and operators of concentrated animal feeding

17  operations, that the State Water Board has been designated by the

18  EPA to implement those regulations in California.  The CWA

19  federal implementing regulations and the Storm Water Permit

20  require that a CAFO with more than 700 milking cows comply with

21  the terms of the Storm Water Permit.  The CWA federal

22  implementing regulations, as revised in 2003 and currently being

23  revised again, impose requirements that CAFOs must comply with

24  above and beyond the requirements imposed by the Storm Water

25  Permit.  These include, among other things, the requirement to

26  implement specific best management practices in the production

27  area of the CAFO, as well as develop and implement a nutrient

28  management plan for application of CAFO waste to land application

16

1  crop fields.   Because the regulations are being modified, the

2  deadline for all CAFOs to submit NMPs to the implementing

3  authority has been extended to July 31, 2007.

4       B.    Contested.

5       1.    Although Defendants' time to file their responsive

6  pleading has not run, and thus Plaintiffs do not know the extent

7  of issues in dispute, Plaintiffs believe the following issues are

8  in dispute:

9       2.    Whether the Clean Water Act and its Federal

10  implementing regulations require the S & H CAFO to apply for and

11  obtain an NPDES permit, rather than be covered under Region 5's

12  WDR.

13       3.    The amount of civil penalties, if any, warranted

14  for Defendants alleged failure to comply with the Clean Water

15  Act.

16       4.    The amount of reasonable litigation costs, if any,

17  to which the prevailing or substantially prevailing party is

18  entitled to.

19  VII. Consent to Magistrate Judge Jurisdiction.

20       1.    The parties have not consented to transfer the

21  case to the Magistrate Judge for all purposes, including trial.

22  VIII.      Corporate Identification Statement.

23       1.    Any nongovernmental corporate party to any action in

24  this court shall file a statement identifying all its parent

25  corporations and listing any entity that owns 10% or more of the

26  party's equity securities.   A party shall file the statement with

27  its initial pleading filed in this court and shall supplement the

28  statement within a reasonable time of any change in the

17

1  information.

2  IX.   Discovery Plan and Cut-Off Date.

3      1.    The parties are ordered to complete all discovery on
4  or before August 1, 2007.

5      2.    The parties are directed to disclose all expert
6  witnesses, in writing, on or before May 1, 2007.  Any
7  supplemental expert disclosures will be made on or before June 1,
8  2007.  The parties will comply with the provisions of Federal
9  Rule of Civil Procedure 26(a)(2) regarding their expert
10 designations.  Local Rule 16-240(a) notwithstanding, the written
11 designation of experts shall be made pursuant to F. R. Civ. P.
12 Rule 26(a)(2), (A) and (B) and shall include all information
13 required thereunder.  Failure to designate experts in compliance
14 with this order may result in the Court excluding the testimony
15 or other evidence offered through such experts that are not
16 disclosed pursuant to this order.

17     3.    The provisions of F. R. Civ. P. 26(b)(4) shall
18 apply to all discovery relating to experts and their opinions.
19 Experts may be fully prepared to be examined on all subjects and
20 opinions included in the designation.  Failure to comply will
21 result in the imposition of sanctions.

22 X.    Pre-Trial Motion Schedule.

23     1.    All Non-Dispositive Pre-Trial Motions, including any
24 discovery motions, will be filed on or before August 15, 2007,
25 and heard on September 21, 2007, at 9:00 a.m. before Magistrate
26 Judge Dennis L. Beck in Courtroom 9.

27     2.    In scheduling such motions, the Magistrate
28 Judge may grant applications for an order shortening time

18

1  pursuant to Local Rule 142(d).  However, if counsel does not

2  obtain an order shortening time, the notice of motion must comply

3  with Local Rule 251.

4      3.   All Dispositive Pre-Trial Motions are to be

5  filed no later than August 30, 2007, and will be heard on October

6  1, 2007, at 10:00 a.m. before the Honorable Oliver W. Wanger,

7  United States District Judge, in Courtroom 3, 7th Floor.   In

8  scheduling such motions, counsel shall comply with Local Rule

9  230.

10  XI.  Pre-Trial Conference Date.

11      1.   November 19, 2007, at 11:00 a.m. in Courtroom 3, 7th

12  Floor, before the Honorable Oliver W. Wanger, United States

13  District Judge.

14      2.   The parties are ordered to file a Joint Pre-

15  Trial Statement pursuant to Local Rule 281(a)(2).

16      3.   Counsel's attention is directed to Rules 281

17  and 282 of the Local Rules of Practice for the Eastern District

18  of California, as to the obligations of counsel in preparing for

19  the pre-trial conference.  The Court will insist upon strict

20  compliance with those rules.

21  XII. Trial Date.

22      1.   December 11, 2007, at the hour of 9:00 a.m. in

23  Courtroom 3, 7th Floor, before the Honorable Oliver W. Wanger,

24  United States District Judge.

25      2.   This is a non-jury trial.

26      3.   Counsels' Estimate Of Trial Time:

27          a.   8 days.

28      4.   Counsels' attention is directed to Local Rules

19

1  of Practice for the Eastern District of California, Rule 285.

2  XIII.      Settlement Conference.

3      1.    A Settlement Conference is scheduled for November 28,

4  2006, at 1:30 p.m. in Courtroom 9 before the Honorable Dennis L.

5  Beck, United States Magistrate Judge.

6      2.    Unless otherwise permitted in advance by the

7  Court, the attorneys who will try the case shall appear at the

8  Settlement Conference with the parties and the person or persons

9  having full authority to negotiate and settle the case on any

10  terms at the conference.

11      3.    Permission for a party [not attorney] to attend

12  by telephone may be granted upon request, by letter, with a copy

13  to the other parties, if the party [not attorney] lives and works

14  outside the Eastern District of California, and attendance in

15  person would constitute a hardship.  If telephone attendance is

16  allowed, the party must be immediately available throughout the

17  conference until excused regardless of time zone differences.

18  Any other special arrangements desired in cases where settlement

19  authority rests with a governing body, shall also be proposed in

20  advance by letter copied to all other parties.

21      4.    Confidential Settlement Conference Statement.

22  At least five (5) days prior to the Settlement Conference the

23  parties shall submit, directly to the Magistrate Judge's

24  chambers, a confidential settlement conference statement.  The

25  statement should not be filed with the Clerk of the Court nor

26  served on any other party.  Each statement shall be clearly

27  marked "confidential" with the date and time of the Settlement

28  Conference indicated prominently thereon.  Counsel are urged to

request the return of their statements if settlement is not
achieved and if such a request is not made the Court will dispose
of the statement.

    5.    The Confidential Settlement Conference
Statement shall include the following:

        a.    A brief statement of the facts of the
case.

        b.    A brief statement of the claims and
defenses, i.e., statutory or other grounds upon which the claims
are founded; a forthright evaluation of the parties' likelihood
of prevailing on the claims and defenses; and a description of
the major issues in dispute.

        c.    A summary of the proceedings to date.

        d.    An estimate of the cost and time to be
expended for further discovery, pre-trial and trial.

        e.    The relief sought.

        f.    The parties' position on settlement,
including present demands and offers and a history of past
settlement discussions, offers and demands.

XIV. Request For Bifurcation, Appointment Of Special Master,
Or Other Techniques To Shorten Trial.

    1.    None.

XV.    Related Matters Pending.

    1.    There are two related matters currently pending in the
Eastern District of California.  They are *Deltakeeper, et al. v.
Brasil and Sons Dairy, et al.*, Civil Case No. CV 06-01464 DFL
(GGH), and *Deltakeeper, et al. v. Silva Brothers Dairy, et al.*,
Civil Case No. CV 06-01452 DLF (DAD).  Plaintiffs filed a Notice

1  of Related Case in each of those cases, as well as this case, on

2  July 6, 2006 ("Notice").  Defendants have not filed a response to

3  Plaintiffs' Notice.

4  XVI. Compliance With Federal Procedure.

5      1.    The Court requires compliance with the Federal

6  Rules of Civil Procedure and the Local Rules of Practice for the

7  Eastern District of California.  To aid the court in the

8  efficient administration of this case, all counsel are directed

9  to familiarize themselves with the Federal Rules of Civil

10 Procedure and the Local Rules of Practice of the Eastern District

11 of California, and keep abreast of any amendments thereto.

12 XVII.      Effect Of This Order.

13     1.    The foregoing order represents the best

14 estimate of the court and counsel as to the agenda most suitable

15 to bring this case to resolution.  The trial date reserved is

16 specifically reserved for this case.  If the parties determine at

17 any time that the schedule outlined in this order cannot be met,

18 counsel are ordered to notify the court immediately of that fact

19 so that adjustments may be made, either by stipulation or by

20 subsequent scheduling conference.

21     2.    Stipulations extending the deadlines contained

22 herein will not be considered unless they are accompanied by

23 affidavits or declarations, and where appropriate attached

24 exhibits, which establish good cause for granting the relief

25 requested.

26 ///

27 ///

28 ///

22

1      3.    Failure to comply with this order may result in

2   the imposition of sanctions.

3

4

5

6

7

8

9   Dated: 11/14/2006                    /s/ Oliver W. Wanger

10                                       OLIVER W. WANGER

11                                       United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28